We'll take up Reed v. Penasquitos Casablanca Owners Association. Good morning, Your Honors. May it please the Court, I'm Elizabeth Brancart, and I represent the plaintiff appellants Joanne Reed and her children and grandchild. With me here today are April Anderson from the Department of Justice, representing the United States as an amicus, and Jim Treglio, representing the Fair Housing Council of San Diego, who is also a plaintiff appellant. What we're planning on doing is dividing our time. I would take the first seven minutes and argue Ms. Reed's appeal, which are the issues of punitive damages and the standing of the minor plaintiffs. Then Ms. Anderson was going to argue the Halpern issue, which is the cross appeal issue on the construction of the Fair Housing Act. And then Mr. Treglio was going to argue the Fair Housing Council's appeal on the issue of injunctive relief. So all of you, please watch your time so that you don't end up going over and taking the other person's argument. Yes. Can I reserve three minutes for rebuttal, or is it on? Yes, again, but just watch your time within the minutes you have. We start the clock now for argument. Yeah. That long introduction. So the first issue I'm going to talk about is the standing of the minor plaintiffs, which the district court directed a verdict against them on the basis that they were not themselves the victims of sexual harassment, and that there was no evidence that they were affected by the sexual harassment of their mother and grandmother. Both of those rulings were erroneous. The Fair Housing Act was enacted in 1968, and by 1972, the Supreme Court had issued its first major opinion on the act, and that was trafficante versus metropolitan life insurance. In that case, it dealt with standing under the Fair Housing Act. And in that case, the Supreme Court said Fair Housing Act standing goes to the limit of Article 3, and that the court specifically held that a person need not be the intended victim or the target of a discriminatory housing practice in order to have standing to sue under the act for an injury caused by that practice. The conclusion of the Supreme Court's opinion in trafficante is equally applicable to the case that's before the court now on the issue of whether the children had standing under the Fair Housing Act to complain of injuries caused by the sexual harassment of their mother and grandmother. And that sentence at the end of the trafficante opinion was that the court could only give vitality to the enforcement of the Fair Housing Act if it gave standing to sue to all in the same housing unit who are injured by, in that case, racial discrimination in the management of the facilities within the coverage of the statute. It's equally applicable here. Our argument was that everyone in the household, the children, could raise injuries that they received as witnesses and living in the same household as their mother and grandmother who was being sexually harassed and stalked. And as far as the evidence of the children's injuries that set out in the blue brief of pages 28 through 31 showing how they were affected. Yeah, I think we know what those are. And then on the issue of punitive damage, yeah. I have a question about that that I'd like to ask you. And it seems that there's a little bit of confusion as to exactly what the standard is for punitive damages in this type of case, assuming. And with respect to Ms. Reed's claim for punitive damages, you know, if Colstad, if that's the standard, then don't you have to show that the PCOA officials knew that a failure to deal with Mr. McDonald may have been a violation of federal law? Well, that is under Colstad, yes. Under Smith versus Wade, yes, but not quite as specific as Colstad. Colstad is like basically you have to know that you're violating Title VII. Smith versus Wade is more you have to know that you're violating. Well, let's assume that that is the standard. What in the evidence would indicate that? Well, there are several things. I mean, I think that we may have to look into what exactly the standard is. But assume that is, just for here. Assuming that is the standard, the evidence in the record showed that the manager of the condominia complex was a professional certified community manager who was supposed to be there to help homeowners associations in their dealings as running the property. But probably the most significant factor was that the vice president of the homeowners association was a retired general from the US Army who had been in charge of sexual harassment investigations and was well aware that sexual harassment was a violation of law, federal law. And that, well, how does it fit into, I mean, the factual predicate, as I understand it on some level, is it first comes to their attention with your client, and then there's some indication of another woman, and then they want them to put it in writing. And then it comes to their attention as this goes on that Mr. McDonald is a 290 registrant that's been convicted of a sex offense of spousal rape and that he's an African-American and they've got concerns about terminating him. But they do learn that he, they don't immediately terminate him after he's found to be a 290 registrant. And then he, apparently, there's evidence that he has access to going, he's got keys so he can go into people's places. Is that, or he has, is there evidence of that? Or what, how's he getting in there? What's the evidence in the record on that? The evidence in the record on, it's particular to Ms. Reed's apartment and that there was something wrong with the door where she believed that she had locked it, but he could still open the door. And on two or three occasions, specifically described in the record, came in. Unannounced. Unannounced and uninvited. And one proceeded to watch a movie and another proceeded to sexually assault Ms. Reed. And another occasion, it was in her refrigerator in the middle of the night. But I want to address, can I just run through the facts on, you asked about what really is showing their reckless disregard? Is that? Or the knowing inaction standard, what facts go to that? Well, as of the day after the sexual assault, when Mr. McDonald came into Ms. Reed's apartment, grabbed her in front of her children and grandson, the next day she went and reported that she was being sexually harassed by Mr. McDonald. She gave her name, information. She was with another woman who also reported problems with Mr. McDonald. That very night, there was a board meeting and the professional property manager described, admitted in his deposition that he told the board who these people were and what their allegations were. And even though the board minutes said they were unidentified people and we need them to put it in writing. Well, I think that's all in the record. I'm getting a little bit nervous that you're using up other people's time. I'm sorry. Just because I think you do have people that are going to argue government positions. May it please the court. I'm April Anderson and I represent the United States. I will address the post-acquisition application of the Fair Housing Act. The Fair Housing Act contains broad language that reasonably reaches post-acquisition discrimination. And even if it could be interpreted to reach only sales or rentals, that interpretation otherwise is entitled to deference. Let me ask you this. I mean, I think what we've got, we've got two sections that we're dealing with. And it's my understanding that the government is, we've got 3617 and then is it 3604. And 3617 seems a little clearer as to the facts in this case than 3604B. And 3604B would be the one that runs a foul, that would create a conflict in the circuit, right? Yes. You're all we don't know for sure because that case went on bonk. So I mean, it's going to be reheard on bonk. It's unclear exactly what the Seventh Circuit's law is. But let me just address your concerns about 3604B. Well, I guess what I'm asking is, I mean, do you on purpose, if it can be resolved under 3617, do you want, are you asking that both be ruled to be applicable regardless of whether it creates a split? Or I mean, are you asking not to regard, not to decide it on the narrowest grounds? You want to decide it on the broadest grounds and why? Our position is that both sections of the statute apply. 3604B protects the terms and conditions for privileges of sale or rental or of a dwelling or the provision of services or facilities in connection therewith. And those words, particularly in this case, privileges, services, and facilities, suggest an ongoing protection for current residents. Particularly here where you have a homeless association, one of the privileges of buying or renting a dwelling at the Casablanca is the privilege of the association's management. The association provides a number of services and facilities, including McDonald's himself, who's supposed to provide some measure of security and rules enforcement at the complex. In addition, there are facilities that pass with sale or rental of a dwelling here. And that includes access to the pool, the other outdoor grounds, the recreation room. So in this case, we believe there are clear services, facilities, and privileges that are tied to the sale and rental of a unit here. I have a slightly different question. Is this issue of post-acquisition really a question of subject matter jurisdiction? Or, I mean, is it or is it really a, what would be a 12b-6, failure to state a cause of action if there were no post-acquisition actions under 3604? I would see it more as a 12b-6. It was argued below as subject matter. But either way, the issue here is the breach of the Fair Housing Act. Right. I just don't see it as it. I know it was argued and everybody treated it as a jurisdictional issue. I mean, I could see how you would say, well, one of the elements has to be that the action took place at the time of the sale or acquisition. And you failed to establish that acquisition. So therefore, you failed to state a claim. But I don't see this as jurisdictional. I don't either, Your Honor, but I don't think much matters now because we're dealing with the scope of the Fair Housing Act and, you know, whether plaintiff's claims could go forward. Perhaps they phrased it this way because there were a number of State law claims. And if it had been dismissed early on, it would have affected the jurisdiction for those claims. Certainly other courts that have looked at this issue usually haven't phrased it in the terms of subject matter jurisdiction. Neither this Court nor the Supreme Court has ruled that a homeowner's association, like this one, merely because they manage dwellings after they are sold or rented, is immune from the Fair Housing Act. Right. Now, the, what are we calling them, the PCOA, PCOA spends a lot of time, PCHA, okay, PCHA. We could call them the association. The association, that's good. The association spends a lot of time arguing, well, we had no power over this. We had no control. We're just a homeowner's association without responsibility for all of this. So we shouldn't even be sued in the first place, that they lack the power. They can't select the tenants. They can't evict the tenants. What's your response to that argument? Well, there's a lot of things they can do. They basically control this privilege of association management, which is connected to the sale or rent of a dwelling because it's something that passes from renter to seller as you buy or sell a dwelling here. It also is involved in the provision of facilities and services that I have described. In fact, it's really the only entity that can control Mr. McDonald and the other employees of the association, and it's the only entity that can control access to the facilities. Under the defendant's interpretation of the law, something that would bar post-acquisition discrimination, we have some pretty unusual results. Basically, once a family moved in to the association, if they then later changed their pool rules to bar all blacks from the swimming pool, they wouldn't have an FHA claim, or if they decided to keep Jews out of the laundry, or if they approached female tenants and explained that they had to abstain from sexual services in return for heat or hot water. And that doesn't seem to be what the intent of Congress was in creating the Fair Housing Act. In fact, for this Court to hold that those claims are not viable and to strike down Congress specifically intended these type of actions to be precluded. HUD, in its adjudication and rulemaking, has accepted the idea of post-acquisition application. There is — Kagan. In terms of to get Chevron deference, does — if the statute — are you arguing that the statute is just clear on its face and so we don't even need to get to Chevron deference, or, you know, how are you — Yes, Your Honor. Or is that your secondary argument, or how is that working? Yes, Your Honor. We believe that the statute is very broadly written and that these terms easily encompass post-acquisition discrimination. But even if you were to agree and to find that it's not quite that obvious or perhaps terms are undefined, you should defer to HUD's definition of those terms and HUD's application of the rule. Some of HUD's decisions have held that owners' associations and landlords who create rules that discriminate against family status, for example, are viable. And these have been enforced against existing tenants as well as present tenants. There have also been HUD decisions and other circuit court decisions about sexual harassment, which almost always happens after a tenant moved in. According to the defendant's view, we would have a situation where a woman could be harassed while she was visiting an apartment that she was thinking about renting, and she would have an FHA claim for that violation. But if the day after she moved in she experienced the same treatment, she would not. Those are the type of results that HUD's interpretation seeks to avoid. One other thing I would like to point out briefly is that this Court has held that Title VII law is an appropriate analog for application of the FHA, and sexual harassment is well recognized under Title VII law. Furthermore, under Title VII law, in this Court's case in Swinton, the Court held that where an employer refuses to discipline a co-worker who is harassing a fellow co-worker, that institution violates, discriminates against that person, even by their inaction. And I think that's an appropriate analog here. And I'll say that I remain in touch. MS. GOTTLIEB Thank you, Ms. Tan. Mr. MS. TAN There are no more questions. MS. GOTTLIEB Thank you. I'm going to try and go as quickly as I can, Your Honor. May it please the Court. James Streglio speaking on behalf of the Fair Housing Council of San Diego. I just wanted to briefly touch on the basis of injunctive relief that was denied in this case. And it was denied for a couple of reasons. First, the Court expressed questions with regard to the jurisdiction issue, which the Department of Justice just spoke about. The second, there was sort of an idea that somehow this was an extraordinary case. And that it could never happen ever again. And what I will say is, it was somewhat extraordinary, even that the facts of the case became so obvious as time went down, as things went along. You had – it's extraordinary that the person, the perpetrator of the harassment, was a registered sex offender, that the – that he was out on the coast. I'll ask you guys just really quickly before you go into that. If the other issues that have just been argued, if appellants were to prevail on those, you know, and apply the statute as the government has just indicated, and if that – plaintiff's counsel or appellant's counsel – Reid's counsel, I guess – saying that the children's cause of action should be able to go forward, would that result in everything that you're talking about just having to go back because it's a different case? Well, I think in one way or another, the case would need to be remanded back to the district court in order for – Because if they won, then it puts attorney – it puts everything in a different posture, doesn't it? It does. It does. It changes the – it would change the discussion. Okay. We've assumed that. But now if we assume, say, they lose, then what's your point? Well, if they lose, then you're – then one of the issues, of course, is subject matter jurisdiction, although it could also be a 12B6 issue as well. And certainly, because the Fair Housing Council's claims are subservient or subsidiary to Ms. Reid's claims, if she can't claim under the Fair Housing Act for these acts of discrimination, then the Fair Housing Council would have that same problem. At the same time, if the court were to find in favor of Ms. Reid and her – particularly Ms. Reid, but her children are sort of, again, are off the side of this issue, then – then injunctive relief in this case would be appropriate in that the Fair Housing Council, and by virtue of being an institutional actor and still being available to hear complaints of housing discrimination from residents of Penney's Case Casablanca Owners Association, could then be pulled back into a future case, particularly when you're talking about a case such as here where you had such institutional paralysis for two months, and for two months it became very obvious that Mr. McDonnell was a bad actor. He was being investigated for sexual assault. He was on parole for – What was the reason the district court denied your motion for injunctive relief? What was the reason it gave? The court felt that this was going to be – this was an unusual situation, that Mr. – essentially that Mr. McDonnell was a bad actor and that he would never – that now that he's gone, there is no need for future relief. The position of the Fair Housing Council, of course, is that it wasn't so much – the extraordinariness was how obvious the whole problem of sexual harassment was in this case. And in virtually no case that we've seen before would you find an actor – the bad actor being someone out on parole for rape, where he's under investigation for sexual assault, where he's – where restraining orders have been imposed against him and nothing's being done by his employer. The next time it happens, the person is not going to be – will not necessarily be out on parole, will not necessarily be under investigation for sexual assault. And it's in those moments that a procedure that we – the Fair Housing Council requested would be necessary to prevent future harm. All right. Thank you. You may proceed, Counsel. Good morning, Your Honors. May it please the Court, Gregory Cain on behalf of Penasquitas Casablanca Owners Association. To be real blunt, this is not a fair housing case. I haven't seen any authority anywhere that addresses this situation that says this is a fair housing case. Well, but you don't seem to give – you don't really address anywhere the issue of Chevron. And so I – that – I mean, they have interpreted by regulations, which would seem to indicate that it is. So what's your – how do you – you know, what's your response to that? My response to that, Your Honor, is this. The interpretation is across the board throughout various districts and cases relative to certain issues in fair housing. And they try and make it as broad as possible. And the question of post-acquisition versus acquisition is in conflict from what I can tell. This is a factually different case. And I think I could probably stand here and argue most of the day. But I want you to address the fact that government doesn't come in every time. All right? So they've got the government coming in saying, yes, these apply. And they apply on their face. I mean, because the government doesn't have – in a way, they don't – I mean, they're defending the position of the government. They're not necessarily – you know, they're not Ms. Reed's attorney. They're not the association's attorney. But the government is saying, hey, they're meant to be applied broadly. They do. But even if you don't – if you can't see that from that, you have to – and the agency is entitled to interpret these statutes. And you've got interpretations out there that make this application. So you've got to tell me why – I mean, if it is ambiguous and the agency has interpreted it, you know, we've got to give Chevron deference. I mean, we can't just ignore that structure. I appreciate that point, Sharara, and I guess to a certain extent I don't understand it. The statutes are clear, and we urge the court to find that the statutes are clear. And we urge the court to find that in certain instances HUD and or other governmental agencies have overstepped their authority. So your position has to be as a matter of law that this conduct – that the statutes are clear, that they're unambiguous, and as a matter of law this conduct cannot be covered. You would – if that's not true, then you're in trouble. I agree with that 100 percent. As a matter of law, this conduct is not Fair Housing Act-covered conduct. I believe this conduct is outside the Fair Housing Act and the state version. I believe that there is an adequate state remedy for the kind of wrongful conduct that occurred to Ms. Reed in this case. And, in fact, I believe her sons and grandson would have been covered by that adequate state remedy, too. But I don't think you can turn this conduct into a Fair Housing Act violation under the clear interpretation of the statutes. And the main reason for that is, as we have said from day one, and as Judge Burns had trouble with, the Owners Association does not own property. They have no control over rental. They have no control over to whom the property is rented. The evictions. They have control over who they hire, Mr. Howard and Mr. McDonald. They hire and fire those people. And I've read the CC&Rs, and they have a lot of authority, even to the extent that its agents, i.e., Howard and McDonald, have the right to enter any one of the dwellings at any time under the CC&Rs. Your Honor, I don't mean to be disagreeable, but I don't read the CC&Rs as giving them the right to enter a homeowner's unit at any time, absent some exigent circumstances. They have the right to enter a homeowner's unit. I'm not going to quote you the paragraph because they're long, and I don't know if I can find it again. But it does. It gives the Homeowners Association and its agents. Does it accept that for a second? I mean, assume I can find that paragraph and quote it to you again. Doesn't that come with some obligation or responsibility over the people that the Homeowners Association hires to be its agents? Your Honor, I agree with you that the association has some responsibility over the people they hire and retain. And I agree that there is an adequate state remedy if they do it poorly or do it ineffectually or do it wrongfully. I disagree, Your Honor, respectfully that it creates a Housing Act violation unless they take affirmative action to affect the acquisition of housing. Well, it doesn't say acquisition, though. It says it forbids a person to discriminate against any person in the sale, in the sale or rental or in the privilege of services or facilities in connection therewith. And couldn't you read that to say that the Homeowners Association certainly provides services in connection with Ms. All kinds of things that she gets with that rental are governed by the Homeowners Association. I recognize that point, Your Honor, and I agree. The Homeowners Association provides services. They're charged with a variety of things, which theoretically should make the living experience at a condominium more pleasurable and enjoyable and takes the burden away from the owners of doing the same thing. The problem is if we extend that to a Fair Housing Act violation without any affirmative conduct on the part of the board, in other words, they're not promulgating rules or regulations which are discriminatory or encouraging discriminatory renting or sales of homes, we would have to extend it to the Kulligan water man. We would have to extend it to the gas and lights man. We would have to extend it to anybody that provides services, whether it be at a condominium or a single individual family dwelling. If they were to come on the premises to repair a deadbolt lock or to replace a light bulb or change out a refrigerator and they were to discriminate or harass somebody, then theoretically Sears and all those other institutions could be liable for Housing Act violations. Well, this is going to be a limiting principle. Well, it seems like you've got a permanent connection to these units. The homeowners association does. And I don't know that I would. It's not too hard to make a mental classification of that that distinguishes it from the washing machine repair man who enters a unit. I agree with you, Your Honor, that it's closer in this instance because of the homeowners association having these responsibilities. And obviously the farther away we get with the more isolated the instance, the easier it is to say no. But if you have a contractor who comes out every week to clean the pool, isn't he going to be subject to the Fair Housing Act if he's discriminating by throwing all the kids out of the pool when he gets there to clean it? I understand this is a ridiculous analogy, but that's where we get to. We get to a point where it becomes clear that we cannot extend the Fair Housing Act to these other circumstances. Well, okay, but there would be some people that in terms of, say, the Sears employee that comes out and fixes something, you don't hire and fire that person as opposed to, and if someone complained to you about the Sears person, you'd tell them call Sears, complain about the person that they sent out. If they complain about Mr. McDonald, they can't go anywhere but to you, and you're the one that hires and fires him, and you're the one that didn't check his background and put a 290 registrant, you know, patrolling around where they got kids and women and other vulnerable people. Believe me, Your Honor, you're absolutely right. We are the ones that made that mistake, and we are the ones that rectified that mistake, and I would submit to you that doing that within a two-month time span with what we knew is not unreasonable at all. I'm also pointing out with respect to the Sears person or somebody else like him, theoretically then Ms. Reed would have an action against Sears, which I think we all agree would not be the case. Well, it might have an action against Sears. Not under the Fair Housing necessarily. No, that's what I meant, Your Honor. But, I mean, we're looking into that. But, I mean, that, well, if you, you know, what's for assuming for a moment, just assume the hypothetical that you lose on those arguments and on the issue of punitive damages. What's the standard on punitive damages? And, you know, is it under Title VII, is it the same or is it different? Or is there some, is that something that's a little bit unclear? I believe the standard on punitive damages in this setting, this factual setting, is very unclear. Well, it seems like the district court may have gotten that wrong, but I'm not sure if, I mean, Colstab looks like that might be more the standard as opposed to what the district court said. I believe, Your Honor, that the district court got the answer correct. I think they, the judge made a couple of statements that may have reflected a slightly different standard. But I think the actuality is that under any reasonable standard, you would have to find that this homeless association essentially knew more than they knew when they didn't act for two months. And if you look at all of the facts, all of these bad acts which Ms. Reed testified to at trial were not known to the homeowners association during those two months. Well, in regular punitive damages that, you know, let's say it's punitive damages in, you know, some sort of state case or whatever, it's the standard isn't that you, that you, that dealing with someone may have been a failure to deal with a federal law. It's not this, it seems to me it's a different standard here than in just regular punitive damages. Well, I think, Your Honor, there are different standards because this is not affirmative conduct.  So that would be one standard. If it was affirmative conduct, they would be subject to an intentional act standard essentially. Now they're essentially subject to a standard whereby they have to knowingly take no action whatsoever in total disregard for the safety rights of Ms. Reed. Well, but I think what appellant's counsel for Ms. Reed said that you had some people on the board and one including a general or something to that extent that had dealt with sexual harassment and that they did have reports to them, they did have reports that he was a 290 registrant, that he had been convicted, he was on and they had restraining orders against, they had reports of these women that he had sexually harassed them. Now why wouldn't that be enough to go to a jury that they knew that they were violating the sexual harassment laws? All of those things you just said, Your Honor, weren't known to the board and the evidence was clear. They got bits and pieces of information over the span of between May 16th and July 19th when he was terminated. They took action and they did things in that interim as well. So it isn't as cut and dried so that the jury could have made a decision. The court, I don't know. Well, but if you take punitive damages away, you're saying as a matter of law that there's essentially not a triable issue. Yes. I'm hearing your argument. I'm hearing their argument. Why shouldn't that just go to the jury? Because as a matter of law, there is no triable issue, Your Honor, because there's absolutely no way to impart to this board sufficient knowledge to ever say under the law that they knowingly took no action in disregard of Ms. Reed's rights. There's no interpretation of the facts that this court had that could lead to that conclusion. Well, it seemed to me that there was a factual that there were people that wanted to fire him when they started to learn things and then there was one person on the board that said, oh, no, no, let's not fire him. I'm concerned about wrong. I know about the sexual harassment, but I'm concerned about wrongful termination. So there's a period of where that goes on for a while. Yes, Your Honor. Maybe that's not enough to come back with a verdict against, but the question is, isn't that enough to go forward? Your Honor, there is that question. One person did recommend or suggest firing McDonald. They decided not to do it. That's not enough to go forward on whether or not they knew all of the circumstances that came to light at trial. They also knew at the time that Ms. Reed had invited McDonald into her home. They also knew that she'd done his laundry. They also knew that they were friends. They also knew that he drove her places. And so a claim of sexual harassment in the general terms was certainly different for them than it was for us today after we learned about the lawsuit. Those sound like very good jury arguments of why you wouldn't give punitive damages, but they tell a different story than what your arguments are. That's what – but anyway, I'll let you return to your argument. Well, I believe, Your Honor, that the judge was totally within the right to say reasonable people cannot differ. You cannot conclude based upon this state of the evidence that this volunteer board did anything knowingly in disregard of the rights of Ms. Reed. They were weighing the situation. They were investigating it. They ultimately determined there was sufficient information to discharge Mr. McDonald. I'll submit to you, Your Honors, that a two-month time span to accomplish this in light of what was being said is not unreasonable. I think that a two-month time span is certainly reasonable, almost reasonable as a matter of law. Well, I'm telling you, though, if, you know, fortunately, albeit I'm not minimizing what happened, not being the arbiter of the facts, I'm not minimizing what happened to the plaintiffs. But if you have a 290 register in two months and in that two-month period someone, like, took a kid out of an apartment, took them out and raped and murdered them, I'm pretty sure a jury wouldn't have much fun with your clients. Your Honor, I just can't agree with you more that knowing this person was a spousal rapist and should have been registered would have made a huge difference in how they acted. And I think it's fair to say that there is some dispute in the evidence as to when they first learned of this. And there is no dispute that it wasn't until sometime around July 13th or 16th. No dispute about that at all. When was he fired? July 19th. So basically within three to six days is what the window of dispute is, to the knowledge span. They asked the police questions, and the police never told them that he was a convicted sex offender and should have been registered. And obviously had they looked it up on their own, they wouldn't have found him because he wasn't properly registered. So I'll conclude with this, Your Honors. And this is something that I think the judge had trouble with as well as I do. Condominiums have been around for a long time, common interest developments, lockups, et cetera. We don't have any solid authority addressing this factual scenario saying that this is a housing violation. We don't have anything saying that this volunteer board should be held to some standard over and above everybody else. They didn't do anything affirmatively to create discrimination and harassment. They didn't promulgate any policies to do anything to affect tenancy. They had no right to evict or deny rental. And if we start holding them to the standards that Ms. Reed and the Fair Housing Council are suggesting, we're never going to get a volunteer board to run a homeowners association. They're not going to want to volunteer to be subjected to the kind of strict standards that are being espoused by Reed and the Fair Housing Council and the government in this case. It's bad enough to be held responsible for things you do on purpose, let alone now to be held responsible for things that you didn't know were even a problem. You know, I understand your argument, and I'm a bit sympathetic to the volunteer members of the association. But if you're going to take on that responsibility, then you have to take it on and do it properly. You can't take on a responsibility and then step back and say, well, I'm only a volunteer, so I can't be accountable for those things for which I took responsibility. And I agree with that. If you're going to take on the responsibility, Your Honor, you have to do it responsibly, you have to do it in good faith, and you have to act as a fiduciary. And I appreciate all of those things. The problem in this case is we're now creating an additional standard and holding them responsible for things that they didn't do on the basis that they should have done something sooner. And I suggest to you that they did the right thing by terminating this guy, and they did the right thing by not knee-jerk terminating him the first time they heard a complaint. They had months of history with this guy where everything they heard about him was good. Well, I guess so, but, you know, I'm a volunteer regent of a university, but I don't get paid anything, any of that, but I can get sued and that we have D&O insurance. Yes, Your Honor, and that can happen and you can get sued, but you know full well what you can get sued for, and that is basically failing to act in good faith and as a fiduciary. If you were to suddenly learn that you might be able to get sued for something that you didn't even appreciate was a liability at the time, you might rethink whether or not you want to be a volunteer. And I can assure you plaintiffs have cited the statistics about how many people live in these common interest development type places. We're going to have serious issues with getting people to serve for their fellow homeowners if we start holding them to liability in this type of a setting, other than that which you can get insurance for, which would be a state negligence tort, which would be covered under an insurance policy. Punitive damages aren't, and this type of intentional conduct is not. So we have situations where public policy considerations may be at play. Thank you, Your Honors. I'll submit at this time. Thank you. Your group took all of its time, so you can have one minute to answer some of the questions. All right. Yes? Yes. Yes. Okay. In response to Judge Callahan's question, there is the standard for punitive damages under the Fair Housing Act is settled in the Ninth Circuit, and that's the Fair Housing of Marin v. Combs case, which is cited in our brief. As far as your question about the citation in the CCNRs, it's at the United States' Excerpt of Records at page 16 is where the information you were discussing, and as far as the information about knowing that there was a, issues were going on at one of the exhibits at the United States' Excerpt of Records at page 50-51, the general the day after recognized in an e-mail that they were vulnerable for this situation. There was also testimony by another board member that they knew a month before they terminated Mr. McDonald that he had been a sex offender, and that's in our brief. And finally, on the issue of subject matter jurisdiction, in the yellow brief, we discussed that at length that although the judge called it subject matter jurisdiction, it was, in fact, a determination on the merits. So thank you. All right. Thank you very much, counsel. Thank you both for your argument. Versus Penasquitos is submitted. Thank you. Thanks.
judges: Canby, Wardlaw, Callahan